IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION
~~THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND~~

| | | |
|---|---|---|
| **THE COMMUNITY CLINIC INC.,** | \| | |
| 8630 Fenton Street, Suite 1204 | \| | |
| Silver Spring, MD 20910 | \| | |
| | \| | |
| **Plaintiff,** | \| | |
| | \| | |
| **v.** | \| | |
| | \| | |
| **HEALTH GRID, LLC,** | \| | |
| 4203 Vineland Road, Suite K6 | \| | |
| Orlando, FL 32811 | \| | |
| | \| | |
| **Serve on:** | \| | **CASE NO. 8:20-cv-03208-PX** |
| Dennis Olis, Member | \| | |
| 305 Church at North Hills Street | \| | |
| Raleigh, NC 27619 | \| | |
| | \| | |
| **AND** | \| | |
| | \| | |
| **ALLSCRIPTS HEALTHCARE, LLC,** | \| | |
| 305 Church at North Hills Street | \| | |
| Raleigh, NC 27619 | \| | |
| | \| | |
| **Serve on:** | \| | |
| National Registered Agents, Inc. of MD | \| | |
| 2405 York Road, Suite 201 | \| | |
| Lutherville-Timonium, MD 21093 | \| | |
| | \| | |
| **Defendants.** | \| | |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff hereby sues Defendant HealthGrid and Defendant Allscripts and alleges:

## I.      PARTIES

1.      Plaintiff The Community Clinic, Inc., d/b/a CCI Health & Wellness Services

("CCI" or "Plaintiff"), is a Federally Qualified Health Center, otherwise known as a Community

Health Center, headquartered at 8630 Fenton Street, Suite 1204, Silver Spring, Maryland 20910. In addition to serving Montgomery County, Maryland, CCI has three sites within Prince George's County, Maryland, including its Greenbelt medical site, located at 9220 Springhill Lane, Greenbelt, Maryland 20770; its Greenway medical site, located at 7474 Greenway Center Drive, Suite 300, Greenbelt, Maryland 20770; and its Greenway WIC site, located at 7474 Greenway Center Drive, Suite 300.

2.      CCI serves primarily a medically indigent patient population, including significant percentages of Medicaid patients and patients with no form of health insurance at all. Patients without health insurance are charged on a sliding fee scale, which at 100% of the poverty level slides to only a nominal fee. Services provided include medical, dental, behavioral health, and nutrition services.

3.      Defendant Health Grid, LLC  ("HealthGrid" or  "Defendant HealthGrid") is a foreign limited liability company, which provides healthcare IT solutions,  headquartered at 4203 Vineland Road, Suite K6, Orlando, Florida 32811, where it maintains its principal place of business.

4.      Defendant Health Grid, LLC is not registered to do business in the State of Maryland and accordingly has no Maryland Resident Agent.

5.      Defendant Allscripts Healthcare, LLC ("Defendant Allscripts") is a foreign limited liability company registered to do business in the State of Maryland. Defendant Allscripts is the parent company of Defendant Healthgrid.

6.      Defendant Allscripts controls the actions of Defendant Healthgrid.

7.      As Defendant Allscripts stated in a press release it issued on May 21, 2018: "Allscripts will integrate the HealthGrid capabilities into its FollowMyHealth platform, enabling

2

provider organizations to reach 100% of their patient populations without requiring their healthcare customers to sign into a portal." Accordingly, as Defendant Allscripts has stated, they have "integrated" HealthGrid into their operations and thus they now exercise complete control and dominion over HealthGrid.

## II.    VENUE AND JURISDICTION

8.      Jurisdiction is proper pursuant to Md. Code, Courts and Judicial Proceedings § 6-103(b)(2) (2020) because Defendant HealthGrid contracted to supply services in the State of Maryland.

9.      Jurisdiction is also proper pursuant to Md. Code, Courts and Judicial Proceedings § 6-103(b) because at the time Defendant HealthGrid entered into the contract, it was an agent of Defendant Allscripts.

10.     In the HealthGrid Solution Agreement entered into by both CCI and Defendant HealthGrid it stated that, "[t]he parties consent[ed] to the jurisdiction and venue of the state and federal courts located in Orange County, Florida for any dispute arising out of this Agreement." However, the Parties did not agree to have the courts located within Orange County, Florida serve as the exclusive venue for any litigation. And, therefore, while Florida might have jurisdiction over the parties, Maryland, as the locus of the services provided, also appropriately has jurisdiction of the contractual matters between Defendant HealthGrid and CCI, and is in fact is the most appropriate state to exercise such jurisdiction.

11.     Venue is proper pursuant to Md. Code, Courts and Judicial Proceedings § 6-202(3) (2020), because Healthgrid has no principal place of business in the State of Maryland.

12.     Venue is also proper pursuant to Md. Code, Courts and Judicial Proceedings § 6-202(3) (2020) because Allscripts has no principal place of business in the State of Maryland.

13.    Furthermore, venue is also proper pursuant to Md. Code, Courts and Judicial Proceedings § 6-202(3) (2020) because CCI resides in Prince George's County, as evidenced by its work sites at 7474 Greenway Center Drive, Greenbelt, MD 20770 and 9220 Springhill Lane, Greenbelt, MD 20770.

### III.    STATEMENT OF FACTS

14.    Around mid-to-late July of 2018, Plaintiff CCI Health & Wellness Services ("CCI") sought to obtain a new solution for its Patient Appointments & Reminders System ("PAR System" or "PARS") and Patient Portal.

15.    The PAR System is an automated system that scans the upcoming schedules in the appointment book and conducts robocall/text/email outreach to remind patients of their upcoming appointments.  This helps to reduce no show rates and provides an opportunity to indicate that an appointment needs to be rescheduled.

16.    In addition to sending outbound messages, PAR Systems allow patients to either confirm that they will be attending their appointments or cancel their appointments.

17.    The information regarding cancellations is then electronically passed on to the healthcare providing entity for use in updating schedules.

18.    The benefit of PARS using automated messaging is that it then does not require staff to conduct the manual task of calling each patient on the appointment book to confirm appointments and/or receive information about cancellations, but rather staff just has to call for the exceptions—those patients who either did not respond to the PAR System or who had to be called for rescheduling.

19.    The Patient Portal is an online system that is patient-facing to provide patients access to their medical records (for example, they could view their current problem lists, allergies,

medications, labs, etc.), with the ability to interact with care teams through secure messaging, and a host of other functions (pre-fill registration, office paperwork) to help offload manual functions and provide patients with options to enable a more seamless workflow for clinics.

20.     CCI had received a grant from the federal government to be used exclusively towards the PAR System and the Patient Portal.

21.     Defendant HealthGrid was amongst the entities that provided a demonstration of proposed solutions for the PARS and Patient Portal needs of CCI.

22.     At the time that Defendant HealthGrid engaged with CCI in July of 2018, it was owned by Defendant Allscripts, due to Allscripts' acquisition of HealthGrid – this acquisition was announced on May 21, 2018.

23.     The press release announcing the acquisition stated that "Allscripts will integrate the HealthGrid capabilities into its FollowMyHealth platform." Thus, Allscripts made clear that it was fully integrating HealthGrid's services into the Allscripts' business operations.

24.     On July 17, 2018, Sonya Bruton, Psy.D, MPA ("Dr. Bruton"), Associate CEO and Chief Operating Officer ("Dr. Bruton") for CCI, met with representatives of HealthGrid so that HealthGrid could make its proposal for a PAR System.

25.     During this July 17, 2018 meeting, Dr. Bruton stated that CCI required software that possessed appointment reminder capabilities in addition to the ability to access the company's existing patient portal.

26.     Specifically, Dr. Bruton expressed CCI's absolute need that the vendor capabilities be bi-directional, meaning that information input into the PAR System by patients would automatically populate and update existing systems that CCI utilized for appointments and patient portals—namely CCI's electronic medical records system ("EMR").

27.     In essence, as Dr. Bruton explained, CCI required that its PAR System not simply provide patient appointment reminders, but that it allow for patients to indicate if they were choosing to cancel an appointment, and this cancellation information would automatically appear in the EMR.

28.     The automated bi-directional capability was materially important to CCI because the health center sought a solution that automated the process of updating the health center's patient scheduling systems based upon patient input regarding appointments.

29.     Additionally, CCI determined and communicated to HealthGrid that automated bi-directional capability was integral because the health center's resources were limited, as it is a non-profit Community Health Center serving a medically indigent population—including large numbers of uninsured patients—and it needed to free its limited staff of medical assistants from manual administrative tasks, so that they could focus on patient care.

30.     At the July 17, 2018 meeting, HealthGrid confirmed that the PAR System they were pitching would be bi-directional with interoperability with the EMR. Had it not been bi-directional with automatic integration with the EMR, CCI would have immediately ceased consideration of this product.

31.     During the July 17, 2018 meeting, CCI also made clear to HealthGrid that its EMR, which integrated patient appointments, was GECentricity. HealthGrid was purportedly familiar with GECentricity because it advertised itself on the GECentricity website as a partner with GECentricity.

32.     Accordingly, HealthGrid was explicitly on notice that its purported bi-directional capability had to interface with GECentricity. With knowledge of this, HealthGrid continued to represent that it had this functionality.

6

33.     CCI requested bids for the PARS and Patient Portal platforms on or around August 18, 2018.

34.     Subsequently, HealthGrid sent a proposed contract ("Contract" or "Agreement").

35.     The Contract contained a Statement of Work ("SOW") which was incorporated into the Contract.

36.     The SOW unconditionally stated that "CCI Health & Wellness and HealthGrid will mutually agree to an implementation and deployment plan for all 34 [medical] providers to be live with at least one service within 120 days of contract signing." The services explicitly listed, among which one was to be "live" pursuant to the terms of the Contract within 120 days of the effective date of the Contract were:

a.     Appointment Optimization Campaign, which was the PAR System;

b.     On Demand Notification, which meant that "Staff can create and send on demand messages to patient populations"; (3)

c.     Waitlist Notification, which meant that "Eligible patients will receive a notification upon scheduling an appointment that they can enroll in a waitlist";

d.     Gap in Care Campaign, which meant "Gap-In-Care Outreach across patient populations for value-based quality measures";

e.     Care Summaries Campaign, which meant that "following each visit with a provider, patients will be sent text messages with a secure URL link to allow them to access their full visit and ambulatory summary, including Problems, Medications, Allergies, etc.";

f.      Patient Satisfaction Survey Campaign, which meant the electronic distribution and collection of "Satisfaction Surveys and Assessment – Questions sent to all patients that directly correlate to patient satisfaction measures."

g.      Mobile and Point of Care Check-in Campaign, which meant providing "Mobile/Tablet Check in";

h.      Meaningful Use Certified Patient Portal, which meant the ability to, among other things, "Provide patients with timely access to their health record"; and

i.      Care Narrative Staff Dashboard, which meant that "The HealthGrid CareNarrative Dashboard will provide the staff with a standardized view of all registrations. Staff will have the ability to track each registration against pre-defined milestones."

37.    CCI and HealthGrid executed the Contract on September 24, 2018 and September 25, 2018 respectively.

38.    Kathleen Knolhoff, CEO of CCI, signed on behalf of CCI, on September 24, 2018.

39.    Raj Toleti, Founder and CEO of HealthGrid, signed on behalf of HealthGrid, on September 25, 2018.

40.    Accordingly, HealthGrid had until January 23, 2019 to deliver at least one of the enumerated services to CCI.

41.    None of the specified services was delivered within the January 23, 2019 timeframe; and, in fact none of the delineated services was *ever* fully delivered.

42.    With regard to the above listed services in the SOW, their implementation was governed by the terms of the Agreement, which stated the following in Section 4 "Installation and Support."

"A meeting to initiate the project ("the Project Kick-off") will be scheduled on a mutually agreed upon date. An overall Project Plan ("the Project Plan") will be

8

developed and include as applicable, a storyboard of screens, interface plan, training plan, change process, and go-live plan with associated roles and responsibilities and timeline. HealthGrid agrees to use its best commercial efforts to deliver and install the associated software on such date as the parties may mutually agree according to the Project Plan. Each party will use commercially reasonable efforts to avoid delays in the Project schedule."

43.    During October of 2018,  CCI and HealthGrid staff collaborated to launch the Project Kick-off meeting required by Section 4 of the Agreement. This Project Kick-off meeting occurred on October 18, 2018.

44.    At the Kick-off meeting, HealthGrid presented the Project Plan referenced in Section 4 of the Agreement, which the Agreement stated would include a "go-live plan with associated roles and responsibilities and timeline."

45.    In compliance with Section 4 of the Agreement, the Project Plan included a Proposed Project Scope and Timeline.

46.    According to the Proposed Project Scope and Timeline, the Appointment Optimization and Post-Care Summary component of the Project was to be completed in January of 2019. The Satisfaction Surveys and Gap-in-Care Campaign was to be completed in March of 2019. The Electronic Check-in and Patient Portal was to be completed in April 2019.

47.    None of these services were delivered in accordance with the Proposed Project Scope and Timeline.

48.    On October 19, 2018, Claire Gagarin, of HealthGrid, the Project Manager, established recurring operational and communication telephone meetings between HealthGrid personnel and CCI employees and contractors involved in the project.

49.    During late October and November 2018, CCI and HealthGrid explored options regarding how to best deliver the projects CCI desired, including the PARS automated bi-directional capability.

50.     In an October 23, 2018 email Claire Gagarin ("Ms. Gagarin"), the HealthGrid Project Manager for HealthGrid's engagement with CCI, wrote a summary of the teleconference between CCI representatives and HealthGrid that occurred that day.

51.     In her October 23, 2018 email Ms. Gagarin wrote:

"I have attached the interface specifications document and outlined the required message types we will need for each campaign below:
Phase 1: Appointment Confirmations/Reminders
Required Message Type:
•       ADT (unidirectional)
•       SIU (Bi-directional).

52.     Accordingly, on October 23, 2018, HealthGrid, through Ms. Gagarin, memorialized in writing its understanding that CCI had a "Required Message Type" which was bi-directional for the appointment confirmations/reminders.

53.     HealthGrid, with plain knowledge of CCI's "Required Message Type[s]", did not in any way represent that it could not provide this service.

54.     Integral to the bi-directional PAR System was its interoperability with CCI's EMR. The specific EMR program provided by GECentricity was named CPS.

55.     In or about October 2018, GECentricity was purchased by the private equity firm Veritas, which changed GECentricity's name to Virence Health Technologies ("Virence").

56.     On November 1, 2018, another implementation call was held between CCI representatives and HealthGrid.

57.     Ms. Gagarin sent a follow-up email after the November 1, 2018 meeting which stated "Thank you for your time earlier today! As a follow up [sic] to our discussion, please see attached for implementation timeline, implementation project plan, and storyboards we reviewed on today's call."

58.     The Appointment Confirmations with Cancelation Storyboard on Slide 3, which was attached, addressed the "Appointment Confirmation Workflow – Single Appointment." The slide laid out the "2 options for cancelling appointments: 1. Appointment can be cancelled in real-time via an outbound interface with PM system OR 2. The cancellation request is displayed in CareNarrative and staff can cancel the appointment manually in the PM system."

59.     "PM system" stands for Practice Management System.

60.     For CCI, the PM System is integrated with its EMR, and therefore CPS is both the EMR and the PR system.

61.     Crucially, HealthGrid was providing CCI with two mechanisms for the cancellation of appointments, one of which was automated—as CCI had specifically requested—and one of which was manual.

62.     Thus, as of November 1, 2018, HealthGrid continued to represent that it had the capability to provide automated cancelations through a bi-directional appointment reminder system which would automatically cancel appointments in the CPS system.

63.     On November 12, 2018, Dr. Bruton of CCI wrote in response to Ms. Gagarin's November 1, 2018 email and its attached appointment reminder/cancellation storyboard. Dr. Bruton stated in pertinent part, "Below is my feedback on the Confirming and Cancelling appointment story boards: Text messages…2. Appointment cancelled in real time directly in the PM system."

64.     Accordingly, in her November 12, 2018 email, Dr. Bruton referenced the aforementioned Slide 3 of the Appointment Confirmations with Cancelation Storyboard and reiterated what was already clear; that CCI wanted bi-directional appointment reminders and cancelation responses which were directly automated to populate in CPS.

11

65.     During the October and November 2018 time period, two ideas were proposed regarding HealthGrid satisfying CCI's bi-directional functionality needed for appointment reminders.

66.     The two methods were: (1) using the CPS Application Program Interface ("API") to allow for interoperability between the PAR and EMR systems or (2) using patient administrative messages ("ADT") and Scheduling Information Unsolicited ("SIU") technology to provide for the necessary interoperability.

67.     On or around November 14, 2018, Fernan Caparas ("Mr. Caparas") of BlueNovo, CCI's information technology contractor, emailed David Howe ("Mr. Howe"), Virence's CPS Integration Engineer, while copying Ms. Gagarin.

68.     In that email, Mr. Caparas informed Mr. Howe that "CCI would like to be able to have a bi-directional SIU interface so that updates in HealthGrid can make the update in the CPS schedule. Claire [Ms. Gagarin]; please elaborate/clarify if any of what I said is inaccurate. Also, is it safe to say that as part of the current scope that Preferred Language field will be pulled through the interface?"

69.     Ms. Gagarin from HealthGrid, who was asked to "elaborate/clarify" did not respond, thereby implicitly acknowledging CCI's repeated and explicit imperative to have an automated bi-directional PAR System.

70.     Mr. Howe responded approximately fourteen (14) minutes later, stating that "Your ADT export does include Primary Language being sent in the PID-15 field. Please note that this can only be exported if a value is entered into the patient's chart for this field."

71.     What this in essence meant was that for the PAR System, there was no bidirectional capability with CCI's EMR through the ADT export. If this system was used, information received

12

back from patients would enter HealthGrid's system, but would then have to be retrieved from that system by CCI employees and manually entered into the EMR—this was contrary to CCI's stated desire, which HealthGrid had assured CCI it could provide both at the pitch meeting and in repeated communications subsequent to that.

72.     Requiring CCI employees to continue to engage in a manual process negated the benefit of the PAR System. In practicality, this meant that CCI's limited personnel resources would continue to be dedicated to administrative tasks, which could be automated, rather than being devoted to patient care for medically indigent patients.

73.     Mr. Caparas then responded to Mr. Howe immediately and asked if  SIU was "something Virence/GE would not be able to support and that we would have to go through a third-party?"

74.     In response to this inquiry, Mr. Howe responded that same day saying, "We [GE/CPS/Virence] can certainly support an SIU import through LinkLogic…" Thus, unequivocal information was presented that CPS could handle HealthGrid imports using existing LinkLogic technology.

75.     Nonetheless, HealthGrid, despite possessing this information, never implemented the "SIU import through Linklogic technology" for reasons that are unknown.

76.     In addition to the opportunity to use the SIU system, CPS had an API which was already created, and HealthGrid was provided with a link to this API.

77.     On November 14, 2018 Brant Casteel, Virence's Senior Solution Architect – Integration, stated that "during the scoping call in October, HealthGrid was advised to work through the Virence partner program to leverage API access for updating appointments in CPS." HealthGrid never successfully did this.

78.     HealthGrid chose to begin exploring the use of its own API rather than proceed with the SIU system which it had originally proposed, and which CPS could "certainly support."

79.     HealthGrid either could not or would not use the existing CPS API. The repeated response from HealthGrid regarding use of the CPS API was that they were "still looking into it."

80.     On November 14, 2018 Ms. Gagarin wrote to CCI and Virence stating that "Without the bi-directional SIU patient responses from HealthGrid will not populate in GE [CPS]. Therefore, the staff would need to go to CareNarrative, our web based staff dashboard, to check on whether the patient confirmed or requested to cancel their appointment. We have many clients without the bi-directional SIU but my understanding is CCI's workflow is optimized and preferred when patient responses go back to GE."

81.     Ms. Gagarin's November 14, 2018 email: (1) acknowledges HealthGrid's technical failure to provide bi-directional messaging with CPS; (2) fails to address how HealthGrid will remedy this and what any timeline for remedial action would be; and (3) explicitly acknowledges HealthGrid's knowledge that CCI desired for patient cancellation responses to automatically populate in CPS.

82.     Two weeks later, on November 28, 2018, Ms. Gagarin wrote to Dr. Bruton and identified the following "Updates to Appointment Confirmation/Reminder Storyboard", particularly identifying CCI's "Request to send confirmation and cancellation request directly back to PM system so staff will only log in to one system", and further stating that "Note: Storyboard reflects this requirement, we will need to have a bi-directional SIU interface in order to send updates back to CCI PM system."

83.     This again demonstrates HealthGrid's awareness of CCI's bi-directional requirements and HealthGrid was now making the representation again that a "bi-directional SIU interface" was a possibility.

84.     Also on November 28, 2018 Ms. Gagarin wrote to Helena Dessie ("Ms. Dessie"), Assistant to the Chief Operating Officer at CCI, and, in answer to Ms. Dessie's previously emailed question, which was "Once staff have logged into the dashboard does the system automatically connect/speak to centricity and next bar? Staff would like to avoid having to login into several systems at the same time," Ms. Gagarin wrote: "Yes, we can do this. We will need the bi-directional SIU interface setup in order to do this."

85.     Thus, unequivocally, HealthGrid, through Ms. Gagarin, answered in the affirmative that it could indeed provide automatic bi-directional updates through the EMR—an assertion that was either intentionally false or a negligent misrepresentation.

86.     On December 5, 2018, Ms. Gagarin sent an email to representatives of CCI which was a "HealthGrid/CCI Call Summary." In this call summary, Ms. Gagarin, noted issues with the bi-directional messaging. Ms. Gagarin stated that "There are obstacles with GE [CPS] accepting the SIU from HealthGrid, as a result we are exploring API integration."

87.     In a December 12, 2018 email from Ms. Gagarin to CCI representatives, which was another call summary, Ms. Gagarin wrote that "HealthGrid is exploring connecting [to CPS] via API connection so that we can update CCI's GE [CPS] via API instead of HL7 integration. This is an important workflow component, CCI does not want to move forward with appointment confirmations/reminders until API integration is complete…There is not an ETA for API integration with GE [CPS]."

88.     This communication stated that HealthGrid would "explore" using an API, but that there "is not an ETA for API integration". This would become HealthGrid's common refrain, misleading CCI into believing that the required bi-directional messaging would occur, on some undisclosed timeline, when in fact it never did occur.

89.     On December 12, 2018, Claire Gagarin also emailed the following message to Dr. Bruton: "I hope your week has been going well! You may have received my voicemail on Friday about the technical integration, I wanted to provide a response in writing as well. At HealthGrid we do have the ability to update your system with the patient responses (confirmed or cancelled). However, GE does not currently have the ability to accept the patient responses from HealthGrid via HL7 integration. HL7 integration is the standard for transferring clinical and administrative data between software applications and is the integration method we have begun setting up with CCI. As a result we are exploring connecting via API connection so that we can update your system via API instead of HL7 integration."

90.     Ms. Gagarin's statement that "HL7 integration is the standard" is in and of itself a false representation.

91.     On January 9, 2019, in yet another summary email, Ms. Gagarin told CCI representatives that, with regard to "Appointment Confirmations/Reminders" the "Next Steps" were "HG to provide HG/GE API integration: No ETA from HealthGrid at this time."

92.     Yet again, HealthGrid was committing to the bi-directional auto-population of appointment cancellations through API technology, misleading CCI, while providing no clear timeframe for this.

93.     On January 16, 2019 Ms. Gagarin sent an email entitled "HealthGrid Weekly Meeting Updates", which was another status call recap. In this email Ms. Gagarin noted that, with

regard to bi-directional appointment confirmations/reminders and API integration: "HG meeting this week on API integration, HG PM to share more information once available."

94.     On January 31, 2019 Ms. Gagarin sent an email to CCI representatives with the subject "HealthGrid/CCI Quarterly Implementation Update." In this email she noted that "Initially Phase I campaigns consisted of Appointment Confirmations/Reminders and Post-Care Summaries with an aim to go-live late Dec '18/early Jan 19." Ms. Gagarin's email also stated that "After conversations with GE, GE stated they are unable to accept the patient response through HealthGrid via standard outbound SIU messages…As a result, Appointment Confirmation/Reminders campaign is on hold until alternative technical integration can be completed via API." Later in the same email, Ms. Gagarin stated that "Setting up API integration with GE is a large project in progress with HealthGrid, but there is not a date for activation yet."

95.     Thus, in this January 31, 2019 message, Ms. Gagarin acknowledged HealthGrid's failure to meet its implementation timeline, acknowledged what HealthGrid needed to do to effectuate bi-directional messaging integrated with the EMR, and stated that such work was "in progress" although there was "not a date for activation yet." All of this misled CCI into believing that the technical integration would be forthcoming, although without a firm deadline.

96.     On February 7, 2019 Ms. Gagarin sent another CCI/HG Call Summary email. In this email, with regard to the appointment confirmations/reminders, Ms. Gagarin wrote: "API integration—no date…API integration does not have a timeline as of 2/6/19."

97.      No explanation was ever given for why after approximately two months of investigation HealthGrid still could not provide a timeline for API integration.

98.     Yet again, on February 22, 2019 Ms. Gagarin sent out a "CCI/HG Call Summary" in which she made the identical statement to that in her February 7, 2019 email that "API integration at HealthGrid does not have a timeline as of 2/6/19."

99.     Upon information and belief, by mid to late February of 2019, HealthGrid had reason to believe that it was encountering difficulties in securing cooperation from Virence which it believed was necessary to establish the API integration. However, this was never conveyed to CCI. Instead, CCI was continually led to believe that the API integration would go forward, although on an as of yet undefined timeline.

100.    On February 29, 2019 Ms. Gagarin sent another call summary email in which she again made the identical statement that "API integration at HealthGrid does not have a timeline as of 2/6/19." Thus, making it clear that HealthGrid had literally spent twenty (20) days in February doing no work on the API integration.

101.    On March 13, 2019 Ms. Gagarin emailed an Appointment Confirmation-Cancellations BASE Storyboard, which still noted that HealthGrid would provide the option that "Appointment can be cancelled in real-time via an outbound interface with PM." The email transmitting that Storyboard included a summary of the state of the appointments/confirmations/cancellation feature which stated "Technical Requirements: Complete." There was no mention of further work needing to be done regarding API integration.

102.    On March 20, 2019 Ms. Gagarin sent an email to CCI representatives with the subject "HG/CCI Meeting Minutes and Action Items" which again noted that for appointments confirmations/cancellations the "Technical Requirements" were "Complete."

103.    On March 27, 2019, in an email entitled HG/CCI Meeting Minutes, Ms. Gagarin emailed a revised Implementation Timeline, which showed that the appointment

confirmations/cancellations would be completed in May 2019. This was a patently false statement, because, upon information and belief, Ms. Gagarin had already been updated by HealthGrid technical personnel about an alleged lack of communication form Virence which was purportedly going to cause an indefinite delay to the API integration. This information was never shared with CCI during the pendency of its business relationship with HealthGrid.

104.    On or around March 28, 2019, HealthGrid sent two invoices to CCI. One was for $25,500.00 for "Implementation & Setup" and the other was for $83,640 for "Annual Pre Care, Post Care, and Point of Care."

105.    Under the belief that the fully operational PAR System with the bi-directional EMR integration would be forthcoming from HealthGrid, as HealthGrid repeatedly represented that it would be, CCI paid this invoice.

106.    On April 10, 2019 Ms. Gagarin sent another of her HG/CCI Meeting Minutes emails. In this one she yet again noted that the "Technical Requirements" were "Complete" with regard to "Appointment Confirmations/Reminders."

107.    In another email with redundant information, Ms. Gagarin, on April 17, 2019, sent a call summary email in which she noted that with regard to "Appointment Confirmations/Reminders" the "Technical Requirements" were "Complete." Ms. Gagarin wrote this again in an April 24, 2019 email, the subject of which was, "CCI/HG Weekly Operational Meeting – 4/24/2019."

108.    Despite her previous false email assurances that the "Technical Requirements" were "Complete"; on May 23, 2019 Ms. Gagarin sent an email to Dr. Bruton confirming that the appointment confirmations/cancellations feature of the PAR System was in actuality still not complete.

109.   At this point, HealthGrid had not only missed its January 2019 initial implementation deadline for the appointment confirmation/cancellation component, but it had also missed its revised May 2019 deadline for implementation.

110.   On June 6, 2019 Dr. Bruton, on behalf of CCI, sent an email to Matthew Fair, Director, Clinical Programs at HealthGrid, terminating the contract because HealthGrid was in material breach of its contractual obligations—primarily, but not exclusively, to provide a PAR System with bi-directional messaging which would auto-populate in CCI's EMR. On or about July 12, 2019, Mr. Caparas noted that the HealthGrid team had not responded regarding CCI's request to terminate their contract with HealthGrid.

111.   On July 12, 2019, Roopak Manchanda, CCI's Chief Information Officer, emailed Raj Toleti, CEO of HealthGrid, to follow up.

112.   To-date, no material communication has been made from HealthGrid confirming the termination of the contract.

113.   All conditions precedent to the filing of this action have occurred or have been waived by Defendant HealthGrid.

## IV.   COUNTS

### Count I: Breach of Contract

114.   Plaintiff incorporates by reference all of the preceding paragraphs.

115.   Plaintiff and Defendant HealthGrid did in fact enter into a valid contract when representatives of both Plaintiff and Defendant HealthGrid signed the HealthGrid Services Agreement in September of 2018.

116.    Plaintiff performed under the contract by cooperating with Defendant HealthGrid and granting access to its systems in an effort to implement the desired bi-directional capability for the PAR System and Patient Portal.

117.    Defendant HealthGrid failed to perform by delaying and ultimately failing to produce production solutions for any areas that Plaintiff paid to have executed by Defendant HealthGrid.

118.    This failure violated HealthGrid's contractual duty to provide at least one "live" service within 120 days of the effective date of the Contract.

119.    Furthermore, pursuant to Section 4 of the Agreement, Defendant HealthGrid was to adhere to the Project Plan which contained a project schedule.

120.    The initial project schedule called for the integrated bi-directional messaging to be completed in January 2019.

121.    The revised project schedule called for the integrated bi-directional messaging to be completed in May 2019.

122.    In March 2019 CCI paid to Defendant HealthGrid approximately $109,140 based upon the agreed-upon project schedule in effect at that time—which called for satisfactory completion of the PAR system by May 2019.

123.    Defendant HealthGrid failed to deliver the PAR system with the requisite integrated bi-directional messaging by the completion of May 2019 nor did it in fact ever deliver this service.

124.    Accordingly, Defendant HealthGrid breached the contract through its breach of Section 4 of the Agreement and its breach of the SOW's requirement that "at least one service" was to "be live" within "120 days of contract signing."

21

125.    Plaintiff suffered damages from Defendant HealthGrid's breach due to losing approximately $109,140 plus interest for the breach of the instant contract.

126.    At all times during the facts asserted in this Complaint, HealthGrid was under the ownership and control of Allscripts, its parent company.

127.    Subsequently, Allscripts is vicariously liable for the actions that HealthGrid took on its behalf during its interaction with CCI.

Count II:  Negligent Misrepresentation

128.    Plaintiff incorporates by reference all of the preceding paragraphs.

129.    Defendant HealthGrid owed a duty to CCI to communicate accurate information.

130.    Defendant HealthGrid had a pecuniary interest in its transactions with CCI.

131.    Defendant HealthGrid repeatedly provided false information to CCI for the guidance of CCI in its business transactions with Defendant HealthGrid.

132.    Defendant HealthGrid explicitly and repeatedly informed CCI that bi-directional appointment confirmation/cancellation automated messaging which integrated with its EMR would be provided.

133.    Defendant HealthGrid never provided this bi-directional messaging with interoperability with CCI's EMR.

134.    Defendant HealthGrid on a regular basis misled CCI into believing that it was working on the integrated bi-directional messaging and that it would be completed. In fact, it was not completed by the initial implementation date of January 2019 nor was it completed by the revised implementation deadline of May 2019.

135.   ~~CCI justifiably relied upon the information presented to it by Defendant HealthGrid. It relied upon this information when paying Defendant HealthGrid approximately $109,140.~~

136.   ~~The misrepresentation was made both at contract formation and there were continuing negligent misrepresentations made after execution of the contract.~~

137.   ~~Defendant HealthGrid did not exercise reasonable care or competence in communicating information to CCI regarding the integrated bi-directional messaging.~~

138.   ~~Defendant HealthGrid should have known its representations were false due to its knowledge of its own capabilities and the discussion with Plaintiff which included Plaintiff emphasizing the reasons why it was materially important for the finished product to have bi-directional capability.~~

139.   ~~Defendant HealthGrid was a GECentricity partner and represented itself as being familiar with the CPS system.~~

140.   ~~At all times during the facts asserted in this Complaint, Healthgrid was under the ownership and control of Allscripts, its parent company.~~

141.   ~~Subsequently, Allscripts is vicariously liable for the actions that HealthGrid took on its behalf during its interaction with CCI.~~

~~**Count III:  Intentional Misrepresentation**~~

142.   ~~Plaintiff incorporates by reference the preceding paragraphs.~~

143.   ~~Defendant HealthGrid made an intentional misrepresentation when it stated that it could in fact support Plaintiff's integrated bi-directional messaging needs.~~

144.   ~~Furthermore, Defendant HealthGrid repeated this intentional misrepresentation in various instances throughout the October 2018 – May 2019 timeframe.~~

145.    Defendant HealthGrid was aware the statement was false.

146.    Defendant HealthGrid intended to induce reliance by Plaintiff upon the misrepresentations.

147.    Plaintiff's reliance upon Defendant HealthGrid's misrepresentation was the cause of Plaintiff's harm.

148.    Plaintiff suffered damages in the amount of over $109,140 that was paid to Defendant HealthGrid for work that was never adequately completed, plus interest.

149.    Plaintiff suffered consequential damages, lost revenue, and additional administrative costs as a result of Defendant HealthGrid's intentional misrepresentations.

150.    Plaintiff's actions were willful and wanton justifying an award of punitive damages.

151.    There is no limitation of liability under Section 10 of the Agreement for intentional misrepresentations.

152.    Accordingly, CCI, in addition to approximately $109,140 that it paid to Defendant HealthGrid, CCI seeks consequential damages, to include lost revenue and additional administrative expenses, in an amount to be determined at trial as well as punitive damages in an amount to be determined at trial.

153.    At all times during the facts asserted in this Complaint, Healthgrid was under the ownership and control of Allscripts, its parent company.

154.    Subsequently, Allscripts is vicariously liable for the actions that HealthGrid took on its behalf during its interaction with CCI.

## V.      REMEDIES SOUGHT

WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting it the following relief from Defendants HealthGrid and Allscripts:

a.   A declaratory judgment that Defendants HealthGrid and Allscripts violated each of the above-enumerated Counts I-III;

b.   Damages in the amount of $109,140 representing the funds it paid to HealthGrid for services which were never delivered.

c.   Compensatory and punitive damages in an amount to be determined at trial.

d.   Pre-judgement and post-judgement interest on all damages.

e.   Reasonable attorneys' fees and costs.

f.   Such other and further relief as the Court deems just and warranted.

## VI.     JURY TRIAL DEMAND

139.    Plaintiff requests a jury trial on all issues of fact and damages arising herein,

*/s/ Robert J. Baror, Esq.*

**Robert J. Baror  (Bar No. 17763)**
**Chief Legal Officer and General Counsel**
CCI Health & Wellness Services
Support Center
8630 Fenton Street, Suite 1204
Silver Spring, MD 20910
Telephone: (301) 340-7525 ext.1185
Facsimile: (301) 495-0318
Primary Email: Robert.Baror@CCIWEB.org

*Attorney for The Community Clinic, Inc.*

26